JOHN COOK

*v.*

ANDERSON FOOD COMPANY.

[Decided July 1st, 1905.]

In a proceeding by a bank to establish certain notes as a claim against the assets of a corporation in insolvency, evidence held insufficient to establish that the notes were given for a loan to the principal stockholder of the corporation in order to enable him to purchase certain stock of another corporation for his individual benefit, instead of for the corporation, and that the bank had knowledge of such fact.

On bill adjudicating insolvency of defendant company and appeal from receiver's rejection of claim of National State Bank, &c.

*Mr. Lewis Starr,* for the receiver.

*Mr. Joseph H. Gaskill,* for the contesting creditors.

*Mr. William D. Lippincott* and *Mr. Edward Dudley,* for the National State Bank.

GREY, V. C.

In this matter the receiver reports upon the claims presented by the creditors of the defendant company.

The National State Bank offered in proof a claim for a dividend, two promissory notes for $26,000 each, both made by the Anderson Food Company, defendant, as promisor, one designated No. 1, which is dated February 24th, 1903, the other as No. 2, which is dated February 2d, 1903, both payable three months after date, to the order of John T. Cox, and by him endorsed. These two notes represent, through a succession of renewals, two original notes, both dated September 20th, 1901,

in one of which the insolvent company was promisor, in the other endorser.

The receiver has refused to allow the National State Bank to participate in the dividend of the assets of the insolvent company, the Anderson Food Company, upon the ground that no consideration proceeded to the Anderson Food Company for making or endorsing the two notes originally given on September 20th, 1901; that the use of the food company's name on those notes by Mr. Cox was unauthorized and unratified by that company; that the food company was only an accommodation maker or endorser at the most; that the officers of the National State Bank, before they discounted the original notes, had full knowledge of the terms of the contract between Mr. Cox and Mr. Anderson which is dated September 20th, 1901, and knew that the proceeds of those notes which were placed to the credit of Mr. Cox were to be used by him in purchasing the stock of the Anderson Preserving Company for himself individually, under the terms of the contract of September 20th, 1901. The receiver finds that those shares were in fact purchased from Anderson by Cox for the latter's sole individual benefit, and not in any way for the Anderson Food Company; that the bank's officers, under the circumstances of the case, were certainly so warned and put upon inquiry; that if they had performed their duty by proper investigation they would have discovered that there was no consideration existing between the food company and Cox as the basis for the making or endorsing of the notes by the food company.

Mr. Anderson was the owner of substantially all of the stock of the Anderson Preserving Company up to September 20th, 1901. Preceding that time, during the months of August and September, 1901, negotiations had been carried on between Mr. Anderson and Mr. Cox for the purchase of the Anderson Preserving Company by a new company to be formed by Mr. Cox. These negotiations resulted in the making, modifying, canceling and renewing of agreements in writing between Anderson and Cox, the last of which, dated September 20th, 1901, was carried into effect.

This contract of September 20th, 1901, was made between

Abraham Anderson and John T. Cox. By it Anderson agreed to sell to Cox, or to his nominee, two thousand two hundred and fifty shares of capital stock of the preserving company upon the making of the payments and performance of the conditions named in that contract. Cox agreed to pay to Anderson $75,000 in cash, to deliver him a mortgage for $100,000 on the plant, and notes of the food company for $58,000. Cox further agreed to sell Anderson two hundred and fifty shares of the capital stock of the food company at $77.77 per share; that the net profits of the food company (which should absorb the assets of the preserving company and assume all its liabilities) should be used exclusively to pay $55,557.50 advanced by Cox for the purchase of the stock, and the obligations to be given to Anderson until all were paid. It was expressly agreed that each and all of the foregoing covenants and promises should be carried out and performed at the same time.

The testimony which it is claimed shows that the National State Bank was aware of the terms of the agreement of September 20th, 1901, between Mr. Anderson and Mr. Cox, appears in the testimony of Mr. Cox, who was the promoter of the Anderson Food Company, and related to conferences between himself and Mr. Hewlings Lippincott, president of the National State Bank, touching the discounting of the two original notes for $26,000 each, the allowance of the renewals of which, as proofs of claim against the insolvent Anderson Food Company, the receiver has refused to the bank.

Mr. Cox was asked, on examination before the receiver, the following questions and made the following answers regarding the agreement of September 20th, 1901, between Anderson and Cox:

"*Q.* What property was transferred under that agreement?
"*A.* The plant, machinery and stock.
"*Q.* Of what company?
"*A.* Of the Anderson Preserving Company.
"*Q.* Anderson Preserving Company?
"*A.* Yes, sir.
"*Q.* To whom was it transferred?
"*A.* To myself, and then to the Anderson Food Company.
"*Q.* Under this agreement?

"*A.* I don't remember the exact wording of the agreement now, but it was for ultimate transfer to the food company.

"*Q.* This money, or these notes that were issued, why did you have the Anderson Food Company sign them?

"*A.* Because the money was loaned for the benefit of the food company, that is, in order that the food company might acquire the plant.

"*Q.* Of what company?

"*A.* Of the Anderson Preserving Company.

"*Q.* Pursuant to this agreement?

"*A.* Yes, sir.

"*Q.* Did you at the time of negotiating the discount of these notes inform Mr. Lippincott or any of the officers of the National State Bank of Camden that there was such an agreement in existence?

"*A.* Yes, sir; fully aware of it."

It is this answer of Mr. Cox, "Yes, sir; fully aware of it," which is claimed to charge the bank with knowledge of all the contents of the agreement of September 20th, 1901, between Anderson and Cox.

All the dealings with regard to the discounting of the two original notes took place between Mr. Lippincott, president of the bank, and Mr. Cox, the president of the Anderson Food Company.

The food company, on September 20th, 1901, had neither plant, equipment or business. It was a close corporation, controlled by Mr. Cox, who promoted it, as all the proof shows, with the assent of all its stockholders, and of the food company itself, acting in its corporate capacity, for the sole purpose of acquiring the plant and assets, &c., of the preserving company, which was controlled by Mr. Anderson.

The theory of the receiver is that the food company, in its corporate capacity, acquired all the plant, assets, equipment and business of the preserving company; and that, coincidently, Mr. Cox, by the same agreement (the contract of September 20th, 1901), separately acquired for himself, in his individual capacity, the two thousand two hundred shares of capital stock of the preserving company owned by Mr. Anderson; that the two original notes were, with the knowledge of Mr. Lippincott, the president of the bank, discounted to enable Cox to buy for himself, and not for the food company, those shares of the preserving company stock.

It becomes a matter of first importance to ascertain whether the proofs sustain the receiver's theory that the two thousand two hundred and fifty preserving · company shares were bought by and for Mr. Cox individually, and not for the food company; and whether the bank, when it discounted the two original notes, had knowledge or warning of that situation of affairs.

The argument made in support of the receiver's finding against the bank assumes that by the agreement of September 20th, 1901, Mr. Anderson agreed to transfer the two thousand two hundred and fifty preserving company shares exclusively to Mr. Cox, and that the bank knew this fact. This is, however, a mistake; that agreement, on its face, declares that Mr. Anderson agrees that he will sell, assign, transfer and set over those shares to Mr. Cox, *"or such person or persons as may be nominated by him."*

It must be remembered that Mr. Cox was the controlling stockholder in the new food company, and that it was through Anderson's agreement of September 20th, 1901, with Cox, that the new food company bought out the Anderson Preserving Company.

Anderson was the controlling stockholder of the preserving company. At the time the testimony was taken in this matter, Anderson was bitterly hostile to Cox. There was no possibility that they combined to color their testimony regarding this transaction favorably to the bank. An examination of that portion of their evidence which deals with the purchase of the two thousand two hundred and fifty preserving company shares will, I think, throw light on the question whether Cox bought these shares for himself individually or nominated another person to whom Anderson should transfer them.

Mr. Cox testifies, as above shown, that the plant, machinery and stock of the preserving company were, by the agreement of September 20th, 1901, to be transferred to him for ultimate transfer to the food company; that the food company signed the notes because the money was loaned for the benefit of that company in order that it might acquire the plant of the preserving company. Cox was asked, "For whom did you buy this stock of the Anderson Preserving Company—for yourself or

for the food company?" and he answered, "For the food company."

Mr. Anderson swore that the consideration of the notes was the plant and stock of the Anderson Preserving Company, which he says he sold to the Anderson Food Company, and that he gave the Anderson Food Company the plant, fixtures, stock in trade, the book accounts, bank accounts and stock of the Anderson Preserving Company, referring to the two thousand two hundred and fifty shares of capital stock of the preserving company. He declares that it was all a part of one transaction.

The testimony of both Anderson and Cox, who made the bargain (though they are hostile to each other), agrees that the purchase of the two thousand two hundred and fifty shares of capital stock of the preserving company was made for the benefit of the food company.

The officers of that company obviously so understood the situation, as is shown by the allegations of a cross-bill filed by the food company, verified under the oath of Mr. Henderson, its secretary, in March, 1902. The thirty-sixth paragraph of the food company's cross-bill contains the following statement:

"And this defendant further says that all of the stock of the Anderson Preserving Company, having been turned over to this defendant company incident to the purchase of said Anderson Preserving Company by defendant, is now held by defendant company."

This unity of the testimony of all the acting parties to the effect that the original notes were discounted by the bank to carry into effect the purchase of the two thousand two hundred and fifty shares of the preserving company for the benefit of the food company, accords with the actual disposition made of the proceeds of that discounting and of the shares themselves.

The undisputed testimony is that the $52,000 proceeds of the discount by the bank of the two original promissory notes were credited on the books of the bank to Mr. Cox, the promoter and principal owner of the Anderson Food Company; that this sum was immediately, by certified check, turned over by Mr. Cox to Mr. Anderson, in a lump, to pay for the two thousand

two hundred and fifty shares of the capital stock of the Anderson Preserving Company.

The interest on both the notes, and on their renewals, was paid by the food company as it came due from time to time.

The certificate for these shares of stock was by Mr. Anderson assigned in blank. It was not surrendered to the preserving company and reissued to anyone, but was deposited with other papers of the Anderson Food Company. When that company became insolvent this certificate of stock of the Anderson Preserving Company, assigned in blank, came into the possession of the receiver of the Anderson Food Company, as part of that company's assets. These shares of stock were sold by the receiver of the food company, as part of its assets, and bought in by Mr. Anderson at a nominal sum, and the receiver has accounted for the proceeds of that sale as part of the assets of the Anderson Food Company. Mr. Anderson evidently believed the shares belonged to the Anderson Food Company or he would not have thus bought them.

That the food company, and not Mr. Cox, as an individual, should have taken over the two thousand two hundred and fifty preserving company shares, was the natural and reasonable result of the situation. The food company had purchased every asset that the preserving company possessed. The capital stock of the preserving company, when it had thus been shorn of all its property, became comparatively valueless to any other person.

Mr. Anderson saw that this result would follow the sale of all the assets of the preserving company to the food company, for he inserted in the agreement of September 20th, 1901, a requirement that each and all of the covenants and promises of that agreement—that is, the purchase of the assets and of the capital stock of the preserving company—"should be carried out and performed at the same time."

That the transfer of the two thousand two hundred and fifty preserving company shares was in fact made by delivery of the certificate to the food company is also shown by the fact that from the time of the transfer of all the assets of the Anderson Preserving Company to the Anderson Food Company, and the delivery to the food company of the certificate of stock for the

two thousand two hundred and fifty shares, the Anderson Preserving Company does not appear to have performed a single corporate act nor to have attempted to do any corporate business. Nowhere does it appear that Mr. Cox ever attempted to exercise, or that he ever did exercise, any individual ownership whatever in or over the two thousand two hundred and fifty shares of the capital stock of the Anderson Preserving Company.

The receiver bases his rejection of the bank's claim upon the fact that no corporate action of the food company appears in the minutes of that company, or in any written memorandum recognizing or ratifying the purchase for that company of the two thousand two hundred and fifty preserving company shares by Cox. Formal corporate ratification of that purchase would undoubtedly be conclusive evidence of the purchase of these shares for the food company, but proof that such a purchase was effected is not limited to entries on the food company's minutes, or to written agreements executed under its corporate seal.

Every person who participated in the transaction, both before and at the time it took place, testifies that the purchase of those shares from Anderson by Cox was made for the food company, and that that company got the benefit of it. It is true, the credit of the proceeds from the discount of the two notes passed on the bank's books to Cox as an individual, and not to the food company's credit, but all the proofs agree that the whole proceeds of the discount were at once paid over by Cox (who was at that time acting as controlling stockholder and promoter of the food company) to Anderson, and that the certificate for the two thousand two hundred and fifty shares was contemporaneously delivered to the food company.

Mr. Lippincott, the president of the bank, who conducted all the business of the discounting of the two original notes, also testifies that the bank understood that in discounting those notes the bank was loaning the money to the Anderson Food Company, which made one of the notes as promisor and endorsed the other as payee.

Some testimony was taken before the receiver regarding the transactions of the food company after the original discounting of these two notes by the bank in relation to the renewal and re-

discounting of those notes. Such testimony, even if it showed that Cox had misused the stock purchased with the proceeds of the original notes, cannot be forceful to charge the bank with knowledge of the situation as it existed at the previous time, when those notes were discounted. At that time all the proofs indicate that the bank, in discounting the food company's paper, acted in good faith, under the same information and belief as Mr. Cox, Mr. Anderson and the Anderson Food Company, that the proceeds of the discount were to go to purchase the two thousand two hundred and fifty shares of the preserving company for the Anderson Food Company.

So also claim was made by way of argument that Cox himself, individually, took the two thousand two hundred and fifty shares of preserving company stock and turned them over to the food company in exchange for shares of its capital stock, and this, it was insisted, showed that Cox, contrary to his own and Anderson's testimony, bought the preserving company shares for his own individual benefit, and not for the food company. I asked the counsel who advanced this argument what evidence there was that such an exchange had been made. It was admitted that there was no proof to support the contention.

If there had been such a transaction it could only have happened after the bank had discounted the notes, and it could not have known of it when it made the discount.

Considering all the proofs, it is, I think, affirmatively shown that the two original notes made or endorsed by the food company were discounted by the bank for the purchase of the two thousand two hundred and fifty shares of the preserving company for the food company; that it was understood and intended by all parties that the proceeds of the discount should be applied to the purchase of those shares for the food company, and that they were in fact so applied.

This view of the testimony leads me to sustain the appeal from the receiver's finding and to reverse his determination refusing to admit the bank to participate in the dividend of the assets of the food company.